UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

MICHAEL D. MOE                          CIVIL ACTION NO. 6:14-cv-02881

VERSUS                                  MAGISTRATE JUDGE HANNA

AQUEOS CORPORATION                      BY CONSENT OF THE PARTIES


## MEMORANDUM RULING


Currently pending is the defendant's motion for partial summary judgment (Rec. Doc. 28) concerning the maintenance and cure claim asserted in the plaintiff's first supplemental and amending complaint for damages.  The motion is opposed. Oral argument was heard on November 24, 2015.  Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, the motion is DENIED.


### BACKGROUND


The plaintiff, Michael D. Moe, was employed by the defendant, Aqueos Corporation, as a diver on May 24, 2013, when he was allegedly injured during the course and scope of his work.  He alleges that Aqueos was negligent and that its vessel was unseaworthy.

According to his complaint, Mr. Moe went down in a diving bell into murky water with little to no visibility.  When he exited the bell on instruction from the dive

supervisor, his helmet allegedly struck a steel stabilizing wing that was affixed to the bottom of the dive vessel, which caused immediate pain and left him stunned.  He was retrieved and taken to shore for emergency medical treatment.

Mr. Moe treated with Dr. Patrick Juneau, III, who performed an anterior cervical discectomy with instrumented fusion at C5-6 and C6-7 on November 18, 2013.  On August 7, 2014, Dr. Juneau found Mr. Moe to have reached maximum medical improvement ("MMI").  Aqueos paid maintenance and cure from the date of the accident through September 30, 2014.  Mr. Moe was terminated by Aqueos on October 1, 2014 (because Dr. Juneau limited him to light duty work).  He then went to work at Hobby Lobby as a stocker for the Christmas season.  Then we went to work for RT Electric as an electrician's helper, and he was still working in that capacity when he was deposed on March 27, 2015.

Mr. Moe's pre-operative symptoms completely resolved following surgery, and he did not see Dr. Juneau between August 14, 2014 and May 8, 2015.  He returned to Dr. Juneau in May 2015, however, complaining of neck pain and pain radiating down his left arm.  Dr. Juneau has recommended further surgery but Aqueos has not authorized the surgery and has refused to resume maintenance and cure payments.

In his first supplemental and amending complaint for damages, Mr. Moe alleged that, after Dr. Juneau found that he had reached MMI, he developed new

symptoms[1] that Dr. Juneau has related to the original injury.  He seeks renewed maintenance and cure payments as well as punitive damages for the defendant's failure to resume paying maintenance and cure.  In the instant motion, Aqueos argues that because Dr. Juneau declared Mr. Moe to have reached MMI, it has no obligation to resume paying maintenance or cure.  Aqueos seeks to have Mr. Moe's claim for the resumption of such benefits and his claim for punitive damages dismissed.

**ANALYSIS**

**A.  THE SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate under Rule 56(a) of the Federal Rules of Civil Procedure when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the

---

[1]     In his first supplemental and amending complaint for damages, Mr. Moe alleged that he experienced an "extreme exacerbation" of his psychiatric symptoms in May 2015, and that Aqueos has refused to pay for psychiatric treatment.  (Rec. Doc. 27 at 2).  However, the parties did not address Mr. Moe's alleged psychiatric problems in their briefing, limiting the discussion to new symptoms of neck and left arm pain.

applicable governing law.[2]  A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party.[3]

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that demonstrate the absence of genuine issues of material fact.[4]  If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact.[5]  All facts and inferences are construed in the light most favorable to the nonmoving party.[6]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that there is insufficient proof concerning an essential element of the nonmoving party's

---

[2]     *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

[3]     *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252; *Hamilton v. Segue Software, Inc.*, 232 F.3d at 477.

[4]     *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[5]     *Washburn v. Harvey*, 504 F.3d at 508.

[6]     *Brumfield v. Hollins*, 551 F.3d at 326, citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

claim.[7]   The motion should be granted if the nonmoving party cannot produce

evidence to support an essential element of its claim.[8]

## B.   MAINTENANCE AND CURE

Maintenance and cure provides a seaman who is disabled by injury or illness

while in a ship's service with medical care and treatment and the means of

maintaining himself while he is recuperating.[9]   Maintenance is a daily stipend for

living expenses, and cure is the payment of medical expenses.[10]   Maintenance and

cure are owed by the shipowner without regard to the negligence of the employer or

the unseaworthiness of the ship.[11]   Maintenance and cure are owed until the seaman

reaches the point of maximum medical improvement.[12]   A seaman reaches maximum

medical improvement when it is probable that future treatment will not result in the

---

[7]      *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520
F.3d 409, 412 (5th Cir. 2008), citing *Celotex Corp. v. Catrett*, 477 U.S. at 325.

[8]      *Condrey v. Suntrust Bank of Ga*., 431 F.3d 191, 197 (5th Cir. 2005).

[9]      *Meche v. Doucet*, 777 F.3d 237, 244 (5th Cir. 2015).

[10]      *Bertram v. Freeport McMoran, Inc*., 35 F.3d 1008, 1011-12 (5th Cir. 1994); *Pelotto
v. L & N Towing Co*., 604 F.2d 396, 400 (5th Cir. 1979).

[11]      *Pelotto v. L & N Towing Co*., 604 F.2d at 400.

[12]      *MNM Boats, Inc. v. Johnson*, 248 F.3d 1139, 1140 (5th Cir. 2001) (per curiam)
(unpublished); *Breese v. AWI, Inc*., 823 F.2d 100, 104 (5th Cir. 1987).

improvement of his condition.[13]  Therefore, the maintenance and cure duty does not extend to treatment that is only palliative in nature and "results in no betterment in the claimant's condition."[14]  Whether a seaman has reached MMI is a medical determination requiring the advice of a physician.[15]  Any ambiguity or doubt concerning a seaman's entitlement to maintenance and cure must be resolved in the seaman's favor.[16]

A shipowner is entitled to investigate and require corroboration before paying a claim for maintenance and cure.[17]  If the payment of maintenance or cure is wrongfully denied, a sliding scale of shipowner liability is applied.  A shipowner who

---

[13]     *Springborn v. Am. Commercial Barge Lines, Inc.*, 767 F.2d 89, 95 (5th Cir. 1985); *Pelotto v. L & N Towing Company*, 604 F.2d at 400.

[14]     *Johnston v. Tidewater Marine Service*, 116 F.3d 478, 1997 WL 256881, at *2 (5th Cir. 1997) (per curiam) (unpublished); *Rashidi v. Am. President Lines*, 96 F.3d 124, 128 (5th Cir. 1996); *Pelotto v. L & N Towing Co.*, 604 F.2d at 400.

[15]     *Breese v. AWI, Inc.*, 823 F.2d at 104; *Tullos v. Resource Drilling, Inc.*, 750 F.2d 380, 388 (5th Cir. 1985).

[16]     *Johnson v. Martin Drilling Co.*, 893 F.2d 77, 79 (5th Cir. 1990); *Gaspard v. Taylor Diving & Salvage Co.*, 649 F.2d 372, 374 n. 2 (5th Cir. 1981); *Liner v. J. B. Talley & Co.*, 618 F.2d 327, 332 (5th Cir. 1980); *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962).

[17]     *Brown v. Parker Drilling Offshore Corp.*, 410 F.3d 166, 171 (5th Cir. 2005); *MNM Boats, Inc., v. Johnson*, 248 F.3d at *1; *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1995), abrogated on other grounds, *Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496 (5th Cir. 1995), abrogated by *Atlantic Sounding Co., Inc. v. Townsend*, ___ U.S. ___, 129 S.Ct. 2561, 2575 (2009) ("Because punitive damages have long been an accepted remedy under general maritime law, and because nothing in the Jones Act altered this understanding, such damages for the willful and wanton disregard of the maintenance and cure obligation should remain available in the appropriate case as a matter of general maritime law.").

is in fact liable for maintenance and cure but who reasonably denied the payments may be held liable only for the amount of maintenance and cure.[18]  If a shipowner refuses to pay maintenance and cure without a reasonable defense, the shipowner becomes liable for compensatory damages in addition to the maintenance and cure.[19]  If the shipowner rejects the claim in an arbitrary and capricious, or willful, callous, and persistent manner, he becomes liable for punitive damages and attorneys' fees as well as maintenance and cure and compensatory damages.[20]

When there are conflicting diagnoses and prognoses from various physicians, there is a question of fact to be determined by the trier of fact as to a plaintiff's entitlement to maintenance and cure benefits as well as a question regarding whether the employer's termination of maintenance and cure benefits was arbitrary or capricious.[21]

---

[18]     *Morales v. Garijak, Inc.*, 829 F.2d at 1358.

[19]     *MNM Boats, Inc., v. Johnson*, 248 F.3d at *1; *Morales v. Garijak, Inc.*, 829 F.2d at 1358.

[20]     *Chet Morrison Contractors, Inc.*, 666 F.3d 373, 382 (5th Cir. 2012); *Morales v. Garijak, Inc.*, 829 F.2d at 1358.

[21]     *Tullos v. Resource Drilling, Inc.*, 750 F.2d at 389.

C.   **Did Aqueos's Obligation End in August 2014?**

In this case, it is undisputed that the plaintiff sustained an injury while diving from the defendant's vessel, HOS MYSTIQUE, on May 24, 2013.  Accordingly, Aqueos had an obligation to pay maintenance and cure to the plaintiff until he reached MMI.  On August 7, 2014, the plaintiff's treating physician, Dr. Juneau, opined that the plaintiff had reached MMI.  Accordingly, it was reasonable for the defendant to stop paying maintenance and cure at that time.  It is undisputed that Aqueos paid maintenance and cure from the date of the accident through September 30, 2014.

An issue later arose as to whether a subsequent deterioration in the plaintiff's condition meant that the plaintiff was no longer at MMI and, consequently, whether maintenance and cure payments should be resumed.  Aqueos now takes the position that its payment of maintenance and cure up to the date on which Dr. Juneau found MMI was reached relieves it of any further maintenance and cure obligation.  The plaintiff's position is that he is no longer at MMI and is entitled to renewed maintenance and cure payments until MMI is again achieved.  Support for both positions can be found in Dr. Juneau's deposition testimony and in his affidavit.

On November 18, 2013, Dr. Juneau performed an anterior cervical discectomy with instrumented fusion at C5-6 and C6-7.  (Rec. Doc. 30-3 at 8).  Dr. Juneau

explained during his deposition that two "cages" were placed in the disc spaces and three screws were used – one each in C5, C6, and C7 – to attach a plate to the front of the vertebral bodies.  (Rec. Doc. 30-3 at 8-9).  At the first post-operative visit on December 12, 2013, all three screws and the plate were in good position, and Mr. Moe's arm pain was totally gone.  (Rec. Doc. 30-3 at 10).  At the next post-operative visit on March 25, 2013, Dr. Juneau noted that there had been a little settling of the plate and slight upward toggling of the caudal screw.  (Rec. Doc. 30-3 at 12, 13).  The caudal screw is the one that was placed in C7.  (Rec. Doc. 30-3 at 13).  The toggling of the caudal screw caused "the plate along the front part of the vertebral bodies to slide down. . . just a couple of millimeters at the most."  (Rec. Doc. 30-3 at 13).  However, the screw was still totally within the bone.  (Rec. Doc. 30-3 at 13, 14).  Despite the movement of the caudal screw and plate, Mr. Moe's symptoms had totally gone away.  (Rec. Doc. 30-3 at 11,13).

On May 1, 2014, Dr. Juneau saw Mr. Moe again.  Mr. Moe reported that, as he was going to sit down, the back of his head hit a shelf, and he subsequently had some recurrence of neck and left arm pain since then.  (Rec. Doc. 30-3 at 16).  But x-rays showed no change in the position of the plate or screws. (Rec. Doc. 30-3 at 16-17).

On August 7, 2014, Dr. Juneau declared Mr. Moe to be at MMI, permanently restricted to light duty work, with a ten percent permanent partial physical impairment of the whole body, and should not engage in any overhead work.  (Rec. Doc. 30-3 at 18-19).

X-rays taken on August 14, 2014 again showed no movement of the plate or screws.  (Rec. Doc. 30-3 at 22-23).  Also, the pain from hitting the shelf had resolved.  (Rec. Doc. 30-3 at 23-24).

Dr. Juneau did not see Mr. Moe between August 14, 2014 and May 8, 2015.

Mr. Moe returned to Dr. Juneau on May 8, 2015 and complained of neck pain and left arm pain.  (Rec. Doc. 30-3 at 24-25).  Dr. Juneau stated that, "for the very first time post-operatively," Mr. Moe "was having pain radiating down the left arm in a classical nerve root type history pattern." (Rec. Doc. 30-3 at 26).  X-rays showed a slight change in the angle of the caudal screw although it remained fully within the vertebral body, and the movement of the screw had caused the plate to migrate down about one millimeter but it was still flush against the bone.  (Rec. Doc. 30-3 at 25-26). In Dr. Juneau's opinion, it would be unlikely for the screw to move, after having been stable for so long, without some force like a bump on the head, coughing, or dry heaving that occurred after August 14, 2014 but before May 8, 2015.  (Rec. Doc. 30-3 at 28-29).  "[F]or it to just toggle without any – any sort of added force would be

unlikely." (Rec. Doc. 30-3 at 41).  But he also stated that it does not take an acute traumatic event for movement to occur.  (Rec. Doc. 30-3 at 27).  Dr. Juneau stated that working as an electrician's helper could have precipitated Mr. Moe's neck and arm pain.  (Rec. Doc. 30-3 at 32).  Mr. Moe told Dr. Juneau that the new pain had come on gradually over a six week period (Rec. Doc. 30-3 at 48), and Dr. Juneau stated that activities of daily living like working, coughing, or bending at various angles could trigger subsidence of the plate and screw.  (Rec. Doc. 30-3 at 48).

An MRI taken on June 5, 2015 showed "a relatively nice decompression of the spinal cord at C5-6 and C6-7."  (Rec. Doc. 30-3 at 34).  It also showed some slight foraminal stenosis or narrowing that Dr. Juneau explained could be addressed by placing rods from C4 to C7 to stabilize the spine even further and prevent the caudal screw from moving any more.  (Rec. Doc. 30-3 at 35).  However, Dr. Juneau also said that he was not "pushing" Mr. Moe to have this surgery.  "If he is in intractable pain with neck and left arm pain, it just doesn't get better, that would be certainly a legitimate option for him."  (Rec. Doc. 30-3 at 35).  But if "he's just had a little flare up of pain for a few weeks" that diminishes over time and with anti-inflammatory medications, the surgery is not necessary.  (Rec. Doc. 30-3 at 35-37, 44).

As to whether the pain of May 2015 relates back to the original diving accident, Dr. Juneau's opinion can be interpreted two ways – as the parties have done

in their briefing.  He said that it relates back because the screw would not be there but for the diving accident (Rec. Doc. 30-3 at 37-38, 42), but he also said it is related to something that occurred between August 2014 and May 2015 although he saw no evidence of new trauma (Rec. Doc. 30-3 at 28-29, 38, 43-44).

Dr. Juneau again saw Moe on June 23, 2015.  Following that visit, he recommended bilateral decompressive laminectomy with placement of lateral mass screws at C4, C5, C6, and C7.  (Rec. Doc. 30-3 at 74).

The plaintiff submitted Dr. Juneau's affidavit, dated October 15, 2015, in which he said this:

> The imaging studies and clinical examinations which I conducted in 2015 demonstrated to me that the screw has began to move again and therefore the surgical solution which I thought was adequate for Mr. Moe, the placement of the plate and screws, has now become unstable. Accordingly, my basis for concluding on August 7, 2014 that Mr. Moe was at maximum medical improvement no longer exists from a medical standpoint, and, in my opinion, it is necessary to perform the surgery which I recommended. . . . .  I believe that the performance of this surgery will improve Mr. Moe's underlying condition and his function, and will eventually result in him reaching maximum medical improvement again, provided we can stabilize his cervical spine.  (Rec. Doc. 30-3 at 58-59).

Dr. Juneau also said:  "As further stated in my deposition, it is my medical opinion that the treatment which I have recommended is directly related to the initial

-12-

injury experienced by Mr. Moe on May 24, 2013 during his employment with Aqueos Diving." (Rec. Doc. 30-3 at 59).

Dr. Juneau's conclusion that the instability of the fusion discovered in May 2015 is related to the original injury appears to be based on the history he received from the plaintiff.  In his affidavit, Dr. Juneau said:  "According to the history given by Mr. Moe and according to all of the x-rays and other imaging studies done up to this time, I have found no evidence whatsoever of any significant intervening trauma between Mr. Moe's release by me on August 7, 2014 and the date he reported with a gradual return of radicular symptoms when I saw him on May 8, 2015." (Rec. Doc. 30-3 at 58).  Dr. Juneau was aware of no such evidence, and none has been presented to this Court.  That is not to say, however, that such evidence might exist and might be presented at trial.

At this stage of the litigation, with a motion for partial summary judgment before this Court, all facts and inferences must be construed in the light most favorable to the nonmoving party.  Since the plaintiff is the nonmoving party, all inferences must be drawn in his favor.  Additionally, any doubts or ambiguities concerning Aqueos's maintenance and cure obligation must be resolved in favor of the seaman.  Complying with these principles and with an absence of evidence of an intervening cause for the plaintiff's new symptoms, this Court is required to resolve

the parties' dispute in the plaintiff's favor.  Accordingly, Aqueos's motion for summary judgment with regard to Mr. Moe's claim for maintenance and cure will be denied.

As noted previously, a shipowner may investigate and require corroboration of a maintenance and cure claim before commencing payments.  If the shipowner unreasonably rejects the claim after investigating it, he is liable for compensatory damages, and if the shipowner's rejection of a maintenance and cure claim is arbitrary and capricious, the shipowner is liable for punitive damages.

The evidence in the record does not demonstrate that Aqueos unreasonably, arbitrarily, capriciously, or callously refused to pay maintenance and cure after Dr. Juneau declared that the plaintiff reached MMI.  Similarly, there is no evidence that its decision not to resume paying maintenance and cure was based on bad faith.  However, having found that the relevant standard of review requires this Court to construe all inferences in favor of the nonmoving party and consequently to deny Aqueos's motion, this Court will pretermit further discussion of the punitive damages issue at this time and preserve that issue for resolution at trial.

<u>CONCLUSION</u>

For the reasons explained above, defendant Aqueos Corporation's motion for partial summary judgment with regard to the maintenance and cure claims first

asserted in the plaintiff's first supplemental and amending complaint for damages

(Rec. Doc. 28) is DENIED.

Signed at Lafayette, Louisiana on November 24, 2015.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

-15-